Good afternoon, Ms. Thomas. This is the disciplinary hearing requested by you in our docket number 17-80187, and this is a proceeding to determine whether the Ninth Circuit should impose reciprocal discipline in the nature of a six-month plus one-day suspension, which is the discipline that was imposed by the state of Arizona against you as a member of the Bar of Arizona. So the scope of this hearing is limited to the question whether you will be permitted to practice in the Ninth Circuit. Nothing that we accomplish in this hearing or these proceedings will affect your standing in the state of Arizona or in any other court, district court or otherwise, other than the Ninth Circuit. And as we made clear in our filings with you, and I think you also are clear about the limited scope of this proceeding, and in brief, our court will respect the determination of the Arizona court unless you can show by clear and convincing evidence that the proceedings there did not or two, that the evidence was insufficient to support the discipline imposed, or three, that some other grave reason exists for this court not to impose reciprocal discipline. So are you with me on all those? I am, Your Honor. Great. So because I'm going to be asking you questions and there's some factual matters that may come to light, I'm going to ask the courtroom deputy to swear you in as we begin. Yes, I do. Sylvia Lynn Thomas. All right. Thank you. So we've received your response to the Ordinational Clause, your supplemental response. We've had access to the Arizona Disciplinary Proceeding Record. I have reviewed much of that material and I've read your responses in particular and many of the other documents. So I don't want you to feel compelled to go through all of that, but it is a hearing and you're entitled to a hearing, and I think it would be appropriate for you to highlight what you think are the key points that would help you sustain your burden of showing that the court should not impose reciprocal discipline. So with that general outline in mind, have you given some thought to how you would prefer to proceed? Yeah. I would like to address those specific points that you laid out, but I'm also open to your questions so that we're centering in on what it is. Right. And I do have some questions, but I thought I would give you an opportunity, and I'm hoping that we will be, because I think that it's pretty straightforward, I think maybe an hour or an hour and a half. That's the time frame I'm hoping to comply with. All right. So why don't you begin, and I'm going to let you just go, but I'm going to also feel free to interrupt you as politely as I can if I have questions. As you talk through things, I don't want to have to try and remember four questions I have. So let me stop you right there and ask you some targeted questions about what you're saying. Okay. With that, you may proceed. Okay. And I first want to say thank you for letting me know that you did have access to the record. It was unclear to me, and so I tried to only provide the documentation I felt was necessary to you. Well, let me give you a postscript on that, because there are some matters that you identified in your supplemental pleading that I thought we don't have handy, and it would be helpful to have copies of that that you could provide. Okay. You're likely referring to the most recent filing. Here it is. Yeah, so in section two of your supplemental response, you talked about additional documents. So here are the ones that we'd like to have copies of. So 2C, the order denying the motion to quash, dated January 20th, 2017. Okay. Also 2G, the state bar opposition to motion to vacate interim suspension and state disciplinary proceedings, dated March 16th, 2017. Okay. And then you also identified the AA through FF. Those are the matters in the Arizona Supreme Court, I believe. And as to those matters, I'd like you to provide copies of those six documents. Okay. And I'd also like you to make that a separate submission along with an offer of the relevance of those documents to the standard that applies to this reciprocal proceeding. Okay. Because that's the Arizona Supreme Court, and we're really reviewing what the state bar did in essence. All right. Okay. Okay. Please proceed. Okay. Your Honor, first of all, underlying what I refer to as a sham proceeding, a sham suspension, underlying that, the first point is that there was indeed an infirmity of proof of facts that would establish that I am guilty of or committed the conduct that I was accused of. Can I ask you, if you don't mind, to start with due process? Yes. And I don't know whether this may be non-controversial, but I'm particularly interested to ensure that you had notice of the proceedings. That is, you had notice of all the matters. That way. Right. It appears that you received e-mails requesting it anyway, so you knew that they wanted it. Yes. You received notice of the complaint. Yes, I received notice. You received notice of the hearing, mitigation, aggravation hearing. I did receive notice of that. And that as to each of those, you had an opportunity to respond, and it may be that they found your response was wanting, but you did. It appears you responded to everything, maybe not to the satisfaction of the State Bar, but it looks to me like you had both notice of what they wanted and an opportunity to respond. I did not. And I would be addressing that under this first issue. Okay. Okay. So the first thing with regards to the notice. When the State Bar in June of 2016 contacted me by telephone to let me know that there was an investigation, a prescreening investigation, that's where this began. At that time, I was not notified of what the nature of the investigation was. I was told that the complainant received a litigation preservation letter from me, which the complainant did, and that he had complained that he didn't know who I was. So that was what I was told the nature of the complaint was. That was left for me to believe for six months that that was the nature of the complainant's allegation underlying a screening letter that was later issued by the State Bar on September 15th. Once I received the screening letter, the significance of that is that within the letter it says, if you're unable to respond by the October 4th deadline, please let us know immediately. And that letter was dated the 15th of September. I called that same day to let them know immediately that I would not be able to respond to that screening letter because of the capability of it interfering with and undermining my pre-filing investigation of an antitrust complaint that I intended to file in the federal court. So let me stop you there. Mm-hmm. So they wanted information from you about the nature of these letters, the legal basis for these letters, the number of letters, and all that. And then you're thinking to yourself, if I disclose this information to the State Bar now, this will prejudice my ability to go forward with my antitrust litigation. And that's correct. Have I got you? That's correct. And to add to that, the complainant himself was a potential defendant. Got it. May I conclude? Yes. The State Bar, also a potential defendant. The Arizona Supreme Court, also a potential defendant via its Committee on Character and Fitness for a fiduciary duty violation. And then a well-known law firm, Posenelli, in Arizona also, and they're also famous for antitrust litigation, also a potential defendant. And the Arizona State University, also a potential defendant. I notified the State Bar of this in my response, immediate response, by telephone. I followed that up with an email saying, here's what we discussed. And once, as we went on, and they continued to extend the time, so to speak, for me to respond, I kept providing them additional information based on what I was finding in my pre-filing investigation regarding these assertions that those five may be defendants. And up until a point where I told them, yes, they will certainly be defendants based on what I have. In the interim, I was providing not copies of all of the preservation notices, but those that I believed I could provide at the time given this grave conflict of interest that they were aware of. I'm sorry. Let me stop you for a second. Sure. I did not see in the record any indication that you had provided any response to this request before you were compelled to do so. Yeah. Oh, okay. I didn't see it. Yes, I did respond by letting them. You provided some of these letters to them voluntarily before the order to show clause hearing? I did. And specifically letters that were sent to the State Bar, their general counsel, letters that were sent to the State Bar president, and litigation preservation letters that were sent to some of their employees. Well, they had those, right? They already had copies of those? Right. What about any others? Did you provide any other copies of any documents? Not for individuals or companies outside of the State Bar. Let me ask another question. I'm sorry. That's okay. Things came to my mind when I read about this. Right. So my first question, and I think this was also asked in the order to show clause hearing, it just troubles me. Why didn't you file a motion for a protective order so that you would simultaneously be able to comply with your legal obligation, as I see it under the state disciplinary rules in Arizona, and also provide some measure of confidentiality for this information that you believed would prejudice your case if it was revealed? For two reasons, Your Honor, and I did address this with the court and I'll let you know. The first reason being I was not in danger of any disciplinary action for not providing the information. Based on Rule 54-D2 of the Arizona Supreme Court rules, there is an exception to discipline built into the language of the rule. And it basically says that as long as I assert in writing the grounds for my delaying or postponing presentation of the information that they were requesting, that I would not be subject to discipline. It would only be subject to discipline if I just said, hey, I'm not going to give you these without asserting grounds for doing so. And the grounds I asserted, excuse me, I'm kind of following my outline here. The grounds I asserted involved the conflict of interest, given that the state bar, the Arizona Supreme Court, and its Committee on Character and Fitness were defendants in the case. That was a grave conflict of interest. Also, the fact that my federal antitrust civil litigation filing was pending and that I was in the midst of pre-filing investigation and discovery. So based on Rule 54-D, and I asserted that several times to them, I was not in, it triggered a discipline exception. Okay. And then the other reason. Let me just continue down that path. So let's assume for the sake of argument that that would excuse you from immediately complying with the request to disclose particular documents. But they also asked you for a description of the legal basis for issuing any of these litigation preservation notices. And they already received it, so they knew that you were doing this. There was no secret that you had sent a number of these notices out, both to the state bar folks and to Dominguez and many others. So now you're saying, well, I can't disclose all of that stuff because of the content of those letters. Well, let me ask you, let me start with this question. I can answer it. So if they had a copy of this letter, the state bar, you knew the state bar has a copy of this letter. All the letters are the same. No. And that's part of the reason why. Okay. Okay. So then I'll move on to the second point. Why were you unable to tell them why you had some legal authority, even for just sending the letters that you sent? They received. They knew. You knew. No question of hiding the ball from anybody. You had already disclosed this, that this was in contemplation of litigation. They asked you, tell us why you think you can do this. But you didn't answer them. In response to this, you filed a response to this request that explained to them in a timely manner why you were entitled under the law to file these notices? Yes. And I want to address a couple things you just said in there, Your Honor. You're asking if I filed a response in a timely manner. Yeah. Again, that refers me back to the exception under Rule 54-D-2. It's a postpone or to delay. And so at such time that I completed my pre-investigative filing was when I had told them that I would be able to respond. Well, hold on a second. What I'm not getting is what basis, what possible basis you could have for saying I need to defer my response to this question. Just the question of what I'm only focusing here on this one question, what authority do you have for sending these out? And I'm doing this. They knew, you knew you sent it to the State Bar. They had received it. Okay. So at this stage, the cat's out of the bag. There's nothing that could possibly prejudice your further case by you telling them and at least complying with their request for. . . And the whole thing could have gone away, it seems to me. If you had said to them, well, here's how I can do it. Here's why I'm entitled to send a litigation preservation notice to people who as of yet have not been named in my lawsuit. Yeah. Have not, and my lawsuit has not yet been filed. And they wanted to know why, how could you do that? And so I'm wondering, why didn't you tell them? They themselves had received it. I directed them to the paragraph within the letter itself that cited the case that provides for litigants before they file their antitrust case. It provides for litigants to send out these preservation notices asking the potential parties to preserve evidence so that it would not be destroyed prior to the litigation. This is within the letter itself. I didn't see that anywhere. It's within the letter itself, yes. Which letter is that we're talking about? The preservation letter that we just talked about that they have. They never mentioned it. It's not mentioned in any of the documents. Oh, yeah. That's what they were. . . We just discussed how I sent that to their general counsel. I sent it to their president. I know. What's the authority? Because evidently the State Board didn't know about it because they asked you what's the authority. So can you tell me? Actually, do you have a copy of one of those letters? I can find it. It'll take me a second, but I'll do it for you, Your Honor. And then I also don't want to miss addressing your other very important question about the packing of the bag at that stage. Yeah. Ed, do we have a copy? Do you have a copy of one of those letters? I do. Okay. Yeah. I should have looked, but . . . Do you have a copy with you now of that letter? I'm looking for it. Okay. There's so many exhibits, Your Honor. Thank you. And it should be the paragraph, near the very last paragraph, where it gives the citation to . . . I believe it's the New York case, and I apologize. And it also requests to speak with . . . I have a copy of this, ma'am. For that purpose, it requests to speak with general counsel so that we can work together to downsize the request for a letter. Okay. So, you say this is a Zubulaki case. Is that it? Yeah, that's the case. And there's also other documents later that came in and referred to the Sedona principles and specific ones of those principles and strategies behind . . . Okay. What is that Sedona? Has that been adopted by any court or any jurisdiction? Yes. All the courts have adopted the state . . . all the courts involved in this proceeding have adopted that. The Arizona Supreme Court . . . And that has to do with email? It has to do with the preservation of electronic evidence and other evidence that's saved, whether it's on email, whether it's on hard drives, external hard drives, whether it's on Palm Pilot telephones, and so on. And so forth. And that was within there. And at one point, the general counsel, John Furlong, and I had a conversation regarding that. And there's follow-up correspondence I had with him, where I had directed him to specific documents in their possession that I would be looking for them to preserve with regards to the antitrust issue. And that some of those had to do with different board meetings and committee meetings, dealing with, in general, the ability of attorneys to conduct and manage continuing legal education seminars, which is part of the work that I would be doing in international markets. And where the crux of the antitrust issue came about. But I did want to, Your Honor . . . And let me just . . . you mentioned a motion that the sum escape clause from 54D. An exception clause. Where's that exception? I have 54D right here. Can you turn my attention to that? Yes. In Rule 54D, it's subsection 2. Okay. And it doesn't specify whether that attorney is yourself or that attorney is someone else. It goes on to say that the failure of that attorney to provide that information promptly, without asserting grounds for their refusal to do so, would subject that attorney to discipline. And, again, I asserted those grounds from day one, when the letter, the screening letter, September 15, specifically requested that if I'm not able to provide it by the October 4 deadline, that I needed to contact them immediately. And so my reading of that is they're asking me to contact them immediately to comply with that or trigger that exception if I can't promptly provide it. So I did so. Like I said, I . . . I understand. Okay. And then going forward . . . Go ahead. Okay. And then, Your Honor, when you were discussing a couple of things, why at the moment we thought the cat was out of the bag, I would then not give them the answer to that one question, which I showed you was within the letter. And I also had a conversation with John Furlong about an ongoing e-mail, where I specifically . . . he and I specifically were working together, like the Sedona principles recommend, to try to say, hey, the scope of this is large. Can you narrow us in on some specific documents and things that we need to preserve and give me some heads up on why? So we . . . there's e-mail correspondence between he and I starting to do that. And then more pressure came from the disciplinary section of the State Bar. The other piece on that is that the complainant, who I refer to as a straw man complainant, I'm not doing that to be facetious, but that's, in reality, from my perspective of reviewing everything, is what his position is. The complainant, who is also an attorney licensed in Arizona, as I'm reading now, and licensed in Mexico, and also has an MBA . . . Dominguez. Yeah. Once we found out that . . . well, it was some six months after receiving the initial call from the State Bar regarding the pre-screening investigation. Six months later, during the briefing on my objection to their subpoena and moving to have it quashed, it wasn't until their response to that came out . . . And this was around December 2nd or December 9th, six months after, when they finally disclosed what Mr. Dominguez's alleged allegation was against me. If you recall, I was told by Mr. McCulley that it was, hey, I got this litigation preservation letter from this Ms. Thomas. I don't know who she is. First, that was incorrect because there is record of my communications with Mr. Dominguez before I began my professional immigration to Mexico. Because he was identified on the State Bar website, not as a licensed attorney in Arizona, but as a consultant, a Mexico legal consultant. So, I had contacted him prior to my moving forward with certain relocation aspects of my firm to do electronic work between the two countries. He knew me. He had a copy of my resume. He had offered some assistance in certain areas, specifically whether I was going to be relocating furniture. But more importantly for me, I was moving my car there. And there was some law that says you can, you can't if it's this year, manufactured, and so on and so forth. And all of that email correspondence is there. He also sent me a legal services engagement letter offering the services. Once I realized he had a misapprehension, I'll call it that, regarding exactly what it was I was doing or planning to do there, I declined those services and I declined his legal services engagement letter. So first thing, why is he saying he doesn't know me or why I sent him the letter, which was the first response that McCulley from the State Bar told me was the allegation. Six months later... Did you meet with him in person? I'm sorry? Did you meet with him in person back then? I did not. Mr. Dominguez, I did not. Okay. It's all email. So, there's the one issue with Mr. McCulley. Why is he saying he doesn't know me? Here's these emails where he and I corresponded specifically regarding the innovative things I was trying to do. That was five years before the preservation notice? It was the preservation notice. It was in 2011. And the preservation notice you sent around 2016? 16. That's five years. Yeah. So I'm just wondering whether it's possible he never met you in person. He may not have recognized your name from five years ago when you had asked for some services but declined, so he didn't go forward? And the reason why I would say no to that, Your Honor, would depend on when you were asking me. Mr. McCulley asked me after Mr. Dominguez, the complainant, contacted him and said, hey, I got this from this lady, you know, so he said. But between Dominguez contacting McCulley, he called me the minute he received the preservation letter. And he and I talked for about seven, nine minutes, and I refreshed his memory about who I was, just in case he had forgotten. And we went over the fact that he had some obligations to me as a potential client under the ethical rules, and we went over a few other things. He recalled who I was. And then after that, he calls McCulley and allegedly says he doesn't know who I am. Doesn't make sense. So then later, six months later, when the State Bar finally releases the email McCulley supposedly received from Dominguez that same day, the email says something to the sort of, I don't know why Ms. Thomas is sending me this letter. I don't know why she's suing this university in Mexico. I serve clients in Mexico. Is she trying to keep me from getting potential clients, which sounds more like an antitrust statement, an allegation against me. I never knew anything about the nature, and here we go back to the notice and opportunity to be heard. I never knew anything about the nature of this prescreening investigation through Mr. McCulley. I never knew anything about the nature of the screening letter from the State Bar until December. That letter is dated September. So for six months, the State Bar is going around investigating me apparently. I don't know what the investigation was about. Eventually they get a subpoena and want me to respond. And recall, there's a conflict of interest there because I told them they're a defendant, but I'm still going to respond. I just am waiting until I file my complaint and my pre-litigation investigation work is done. And I continuously tell them this over and over again in e-mails, especially which once they got an order to show calls here and scheduled, they did not submit to the judge. They actually say we have an e-mail string going on. You sent me this letter through e-mail. I called you that same day and said, hey, here's why I can't respond by October 18th. This is in compliance with 54D2. I've triggered the exception because I'm cooperating, but I'm also giving you my grounds. And you go through and pick out any of those e-mails between September 19th and, let's say, October 16th. And you pick out of those strings any of those e-mails where I wrote and listed those asserted grounds. And then you submit that to get probable cause, to have this hearing. You submit that to the Attorney-Disciplined Probable Cause Committee to get them to quash, to get them to deny quashing or granting my objection to the issuance of the subpoena. This is the problem there with the notice. I had no idea. On what document did you find out about the Dominguez complaint? It was in response to my opposition to the issuance of the subpoena and a motion to quash the complaint. And that's where they disclosed the e-mail dated the first date that I spoke with McCulloch, saying where he said, oh, Dominguez is just saying he doesn't know who you are. He doesn't know why he got this. Tell me again why you didn't file a motion for a protective order. Oh, and I was getting to that next. The reason I didn't file the motion, again, because I'm protected from this Rule 52D exception. Discipline is not an issue. You're talking about 54D? 54D2. I'm just reiterating that. You said 52D. I'm sorry. I just wanted to make sure I'm with you. I did that a couple times in the pleadings too, I noticed. Later. Don't worry about it. We'll figure it out. Okay. So it's 54D2. So the reason why I didn't file the 70G, and in that particular rule and subsection, it provides that I would have to submit to giving up a lot of discovery that's relevant to my antitrust litigation case. So then I'm giving this to a defendant, State Bar. I'm giving it to Defendant Arizona Supreme Court, XRL, State Bar. And on top of that, there's other rules within the Supreme Court rules that provides that Dominguez, as a straw man complainant, would be able to have copies of everything that I'm submitting. Well, you could ask for it to be done ex parte. Ex parte protective order under seal, you could ask for a unethical law. But who am I asking for it from? No. Well, you can ask for somebody to be designated, to be appointed and designated to have those documents with a protective order and disclose only as needed. And also I have to subject myself to signing authorizations for my medical records and other things that are not relevant as a State Bar, again, a defendant. They only asked you for those letters. They didn't ask you for medical records. No, under Rule 70G. It says, if I go and request a Rule 70G protective order, then for me to get it, I'm saying, hey, in exchange for you giving me that, then I've got to give you something, too. And here's what it is. And they're listed in there. And some of these things are me signing authorizations to disclose to the State Bar a whole bunch of stuff that would all of this in violation of my guaranteed protections under the Constitution. And I address those also in my briefings, the various briefings that are on the record, that there's no need for them to have that information. For me, it's like, okay, I'm giving defendants in an antitrust suit information about my personal or giving them carte blanche my signature on any type of disclosure that they might ask me for. And, again, we're back to the assertive grounds under 54D2 for my not promptly disclosing things to what they were asking me for. I understand. I don't want to keep you from getting all your points in. Okay. So, again, no real notice of the nature of the accusations against me. And that is a violation under the Constitution as well for equal protection. It's a violation for self-incrimination and things like this. Some of those deal with criminal, but the State Bar says that their proceedings and process is a quasi-criminal proceeding. And those protections should be and are guaranteed to me. And they're asking— Hold on just a second. I'm sorry. This is a screening process at this stage. It wasn't a complaint yet. And then when you did not comply with the request for information in the screening process and then refused to comply, it was only after that stage that they actually filed a complaint against you. Yes. And we're to that stage next.  I believe I've provided Your Honor with evidence, or at least directed you where it is on the record, showing that there were due process violations throughout the prescreening and the screening letter that led to the contempt order for my not responding to the subpoena. And the subpoena was a written response to the screening letter. So I believe I've covered the due process issues within there or equal protection of law issues that then led to an interim suspension and finding of contempt against me. Right. And that was the hearing that was held where those e-mails—I showed the judge how those e-mails were not— were actually portions of e-mail streams that showed the Rule 54D exception were selectively removed by the State Bar. And his reliance on that to find me in contempt and to interim suspend me. So from there— You and he disagreed. You concluded that you were entitled to say, under 54D, I can respond by saying I'll respond later. I can't respond now. I will respond later for the reasons that you stated, that you didn't want to jeopardize your litigation. And he said his position was, no, you've got to respond. You can't just say my response is I'm not going to respond. And he found that to be contemptuous. He found that to be contemptuous, but he erred in that. And later, when I filed a motion, I complied and provided all of those preservation letters and the answers, some of which they had prior to, about why was I sending out preservation letters. After that, because during that hearing, he had said, you know, I'm not going to interim suspend you, or I won't suspend you if you can provide that stuff by 4 p.m. or something of this sort. And I explained there's no way I'd be able to get it done by then. I asked him to, since he was entertaining the idea of not following through with a suspension, I asked him to at least give me until Friday. I thought then I could, but it turned out there was so much work involved in pulling everything together because I work electronically for the most part, so I'm sending all of these out. And I'd been sending them out for some time, and I was sculpting them per defendant in some cases, depending upon my relationship with them and information that I had shared with them that they may have shared with other parties. So because of that, I complied with what he asked by the date that he set in the suspension order because I couldn't realistically get it to him by 4 p.m. So when I responded and provided that information, and then he was reinstating me based on that, I moved for that reinstatement, but I also moved for him to, under authority provided to him, under Rule 47, I think, and 48, to vacate the suspension altogether because in my response there was an affidavit there showing how long it took me to get all of those things together, and in the amount of time that it took, there was no way I couldn't have gotten it done, even if he had told me the Friday. And then also I moved within that same motion for him to vacate the suspension and also to stay indefinitely further disciplined regarding this matter because at that point they had what they wanted, and he denied. And in that motion, I attached an affidavit that included all of those emails that the State Bar had intentionally, selectively removed, showing that the discipline exception was triggered and that I was cooperating and providing them with my assertions as to why. I submitted that to him in saying, hey, on the record, on the transcript, you said you're not having those emails is the reason why you're able to suspend me because of the appearance that I was not cooperating, that I was just willy-nilly saying, hey, I'm not going to give you these until I'm ready. And so I'm saying to him with this affidavit with all of those emails, hey, take a look here, Your Honor. Here's the emails. They show that I had done exactly what I told you I had done in my communications with the State Bar, and that also. And here are copies of those email chains. They're attached to, I have an extra copy if you'd like it. They're attached to the affidavit dated, it's an affidavit from Yoshi. And they're attached to that. And there's two affidavits from Yoshi. This one would be the one, yes, this would be the one dated March 17th. Okay, so we have that. You have that. And I said, hey, as you can basically see, I was complying with everything. This wasn't a sham for me. Here's 140 litigation preservation notices. They're tailored to each defendant, so I couldn't just give them one and say, hey, here's how it goes. But at any rate, I'm saying, hey, I'm an honest person here. I'm not saying that I'm above discipline. I'm following what the rule says. Here's those emails. So let's call this a wash and vacate that suspension altogether because it's hurting me. It's out there on the website, and it says that I could be suspended for mishandling funds, for committing a crime, for whatever heinous things are out there. And he said no, sorry. I'm not staying it. We're going to go forward. He said he wouldn't vacate it or stay it. Which then allowed the State Bar to move forward in filing their complaint. Here's the other interest points on no notice or opportunity to be heard. In order for the State Bar to file that complaint, they have to get a probable cause order from the Arizona Probable Cause Committee. Attorney Discipline, sorry. Attorney Discipline Probable Cause Committee. That order, at the time that order was issued, the Probable Cause Committee had already reviewed my briefing on why they should grant my objection to issuance of that subpoena and why they should quash it altogether. In that briefing was the other affidavit from Yoshi dated December 23rd that showed from June 8, 2016, until December 2nd when the State Bar finally admitted what the true nature of the cause was, I didn't have notice of anything. They rightfully should not have given that probable cause order, but what was really interesting about that, Your Honor, is the Probable Cause Committee, even though they denied my objection to the subpoena, denied my motion to quash, they did not order me to respond to it. I found that interesting. To respond to what? To the subpoena. They did not order me to respond to it. The Probable Cause Committee. And my reasoning... You hadn't already responded to the subpoena? Not at that point, no. I'm sorry, I had to go back for a second because the Probable Cause Committee were the ones who I addressed my motion to... Oh, quash. My objection. That was the motion to quash. Objection to quash. But did they have authority to do that? They did, except they used Rule 48, and I'm sorry, I don't have the subsection in front of me right now, to say that the Supreme Court did not grant them authority to grant me that objection against the State Bar because my objection was based on the State Bar's misconduct and having hidden those emails, concealed those emails, and other misconduct related to their investigation. And they said that the Supreme Court of Arizona does not give them authority to grant me what I wanted based on State Bar misconduct. Now there's a rule, there's a couple of them, it's 48, I think it's like K through M, that talks about the State Bar and its position when they're working a case that if they commit misconduct, in other words, if they violate the very rules that they're entrusted to regulate and make sure that us attorneys are abiding by, if they violate those rules while they're conducting an investigation, they cannot be held to those violations unless I show two occurred, which I had, and then the Probable Cause Committee could then file something regarding that. So then they could have acted on my objection. But they chose not to, and it says that, I think the one subsection down, I believe it's L or M, that if indeed they did, the disciplinary judge, the presiding disciplinary judge, would be the determining factor on whether or not he would stay those proceedings against them when they've committed ethical misconduct in order to falsely accuse someone else of committing ethical misconduct. So I guess my next question is, having heard all of this, why didn't you file an answer to the complaint stating all this as a basis for fighting the complaint? Two reasons, Your Honor. First of all, because the Probable Cause Committee already knew about the concealment after they reviewed that briefing, they then turned around and authorized the State Bar to file a complaint against me without probable cause, because now they know they have all the emails and everything. But they weren't going to be the decision maker on adjudicating your complaint. The presiding disciplinary judge would be. And later I filed a motion to disqualify and have him recuse himself. That was at the mitigation hearing. I'm just asking you about why didn't you defend against the complaint and raise all these issues that you're saying right now and make a record? I did defend against the complaint, but not by answering it. The reason why, I'm going to tell you. The complaint was filed and captioned under a suspended member of the Bar. All other documents that are on record show, in regarding Sylvia L. Thomas, a member of the State Bar. The complaint was captioned a suspended member. The complaint was prepared well after I was reinstated. So why didn't you move to change the caption? I brought it to the attention of the attorney, and they ignored me. So what I did was filed an opposition to the Rule 58k proposed report. And in that, through that opposition. That was the 58k, was the proposed report on the mitigation and aggravation, right? That's before that. It's before. Oh, it's on the disposition of the complaint? Exactly, because they filed a. . . Right, I'm sorry. The clerk entered a. . . Okay, in my opinion, from that stage forward, anything that. . . By this state, you're already defaulted, right? They entered a default, but they entered the default under a different action where no complaint was issued. So it's like you've got this action over here against Sylvia Thomas, a member of the Bar. That, for all intents and purposes, really isn't enforceable. But then you've got this other matter. And over here, no complaint has been filed. No complaint has been authorized. No probable causes. So you're saying because it said suspended, it was invalid? It was invalid. And at what stage did you bring that to the attention of the State Bar, presiding disciplinary judge? There is an e-mail communication that I sent to the State Bar, and I said, I'm not clear on whether it is your intent to correct this. But why didn't you file something in that proceeding? I mean, sending an e-mail to the opposing party isn't the same as filing something with the court and saying this is not . . . I don't . . . I object to this for the following reasons. This has no application to me because I'm not suspended. Two reasons. Prior to filing pleadings, it's part of my . . . I take it as part of my duty to try to speak to the opposing attorney to see if we can come to an agreement. And for them to actually go ahead and admit, hey, this was our error, they would then have to serve me properly with the complaint. Up to that point, I had not been served. And because they were choosing to go that route, for me to respond on the record to that complaint as if it was valid, could be used against me to say that I responded to the complaint. And so, I have to move forward with this action that really doesn't exist. But you were served with it . . . I was not properly served because it was . . . You're saying because it was not you, active member, but it was suspended. There's no . . . No Sylvia Thomas suspended, that's not me, sorry, doesn't apply to me. Is that what you're saying? That, but more so, there's no action that has been filed with that caption. Every other document has a member of the bar. And so, it was a responsibility as I brought it to the attention of that attorney for them to issue a new complaint and properly serve me with it. But they were choosing not to for strategic reasons, wanting to move forward with this discipline against me, all for what I see as antitrust motives regarding my work . . . And you raised this in your 58K? Yes. This whole issue about suspended? All of that is in there. And what I ended up doing was responding in opposition to the 58K. And within there, I go through every single one of their allegations and I state whether or not I agree with that and the reasons why. And then I also state why the complaint was not a valid complaint. There's a rule in the Arizona rules that says how a complaint has to be captioned. It also states that that rule is grounded on Arizona civil procedural rules about the captioning of a complaint and service of the complaint. And I addressed those. Was this issue addressed? I don't recall this issue being addressed in the mitigation order or the order of suspension. I brought it up, but it was just ignored. There's also on the record where the judge says, you know, I could take judicial notice of this, but I'm not. Did you raise it at the Arizona Supreme Court? All of that is raised. And a couple of things I did to address that. Every time some form of abuse of discretion on behalf of the judge or the probable cause commission arose, I noticed an appeal of that to preserve an objection, to get it on the record. I was doing that because of the exhaustion doctrine so that the Supreme Court has a record of my objections to these things. And later I motioned to combine the appeals. And after that, I continued to do that. And that leads me into discussing where there were other grave reasons why due process was not followed and why this court should not grant reciprocal discipline. As you know, this court has an obligation to make certain that it's not reciprocally disciplining someone where the discipline underlying was outside of the parameters of due process. And I believe I've showed you, demonstrated today on the record, several areas where due process was not followed, meaning notice and opportunity to be heard, testimony that was falsely given, omitted evidence, the judge abusing his discretion, because the discretion is there for the judge to either vacate that suspension altogether or stay the continuing discipline. He decided not. And then once he was noticed that he had relied on false testimony, omitted evidence to interimly suspend me, there's on the record that shows a bad temperament at that point and favoritism toward the state bar where the judge vilified me within the motion, within his orders, granting the reinstatement in part and denying the vacation of the suspension and denying the stay on the discipline. And the judge actually states after he's been noticed, hey, you relied on false testimony and omitted evidence. At that point, I'm assuming he had no knowledge of it. But then afterwards, why wouldn't a judge want to correct that on the record? Instead, the judge, after showing a notice of errata related to an admonishment against me and changed it from admonition to admonishment, he stated within the order that I had a tendency to not follow rules, that I had a disinclination to follow any rules but those of my own and then again relied on information submitted by the state bar in their opposition of my motion saying that I never discussed with them a stay, that I tried to fool the judge into believing that I had discussed a stay with the state bar prior to my filing it and I had and they did not submit that email either. They submitted an email stream and had pulled that part out as well. Later, I provided that on record to the Supreme Court when the first appeal was filed. I had also within that email stream talked to the state bar. That's on that March affidavit? Yes. These are the emails from it? Those are there and also in that stream, I had told the state bar, I'm going to reply to your response in opposition to my motion because yes, we did discuss these things and you know it and I asked them several times to please confirm that I have done so in the emails and then eventually they affirmed and tried to qualify the affirmance outside of my favor. The other thing is the grave issues are from the state bar's initial sin, if you will, in violation of the very ethical rules that they're designated to protect, from their initial omission of those emails and giving that false testimony, from there, and I use the term begat, derived, all of these other pleadings that are first a complaint, captioned incorrectly and in violation of rules of evidence, trying to claim that I have now a bad character that should be put on record. I've already been suspended. What more can I do? Then the judge vilifying me saying, oh, she has a troubling pattern of disinclination to follow the rules and then on the website it says I'm suspended. It could be because I misapprehended funds. It could be I've done some criminally heinous thing. It could be all of these things is what it was saying on there, which was none. Then this is all interfering with my ability to work as an attorney, to gain clients. It's interfering with my reputation in Mexico through the NAFTA, which allowed me to immigrate there under certain conditions. It's interfering with all of this, and again, recall this complainant is a Mexico licensed attorney like me. He's now an Arizona licensed attorney like me, an MBA like me, who all of a sudden disclosed this antitrust language. Can I ask you a question about the original sin? The original sin, yes. I just want you to know I'm really listening to what you're saying. I know you are. So you've mentioned that it was very – there was a denial of due process because you didn't – you knew they wanted this information, but I guess you didn't know why they wanted it or what the basis was that they wanted it. So I'm trying to put myself in your position now in terms of thinking about what was going on at the time that you received this prescreening letter asking you for information. Now, you had – you had your conversation with Dominguez just before they sent you that letter, right? No. It wasn't just before. I had a conversation with Dominguez the same date as the letter. Okay. I mean, but it was just minutes before or hours before they sent you this thing, right? You received it. It wasn't hours. It was months later. Okay. So when you received the prescreening letter asking you for this information about your litigation preservation notices, what did you think was the – what do you think was causing them to do that? And can I clarify one thing, Your Honor? Yeah. You referred to a prescreening letter. That's not exactly what it was. Initially, there was a prescreening investigation by telephone, okay? Okay. And that call came to me from the State Bar's prescreening group, which is where this McCauley comes into play. Months later in September – that was in June. Months later in September is when the State Bar furthered the investigation up the ladder and saying, yeah, there's something here. We want to really get into this. That's when a screening letter is issued. Okay. Hold on a second. On the timeline I see, you sent your litigation preservation notice to Dominguez on June 3rd. Yes. Five days later, he sends an email to the State Bar saying the things that you said earlier. In between there, he got the letter June 3rd and called me immediately. Right. And we talked. And you talked. Okay. But then he sends an email saying, I don't know who this is. He said that you're talking to me. That was – okay. Then on the same day that Dominguez sends an email, you receive an email from the State Bar counsel with direction to provide the basis for sending the notice. So that was the first inkling you had something was going on here, right? The first – and I want to say – From the State Bar, right? They called me first. Okay. Before sending that email. So the inkling I had was the phone call. Okay. So then you received this email asking you to provide the basis for sending the notice, for sending a litigation preservation – did they mention Dominguez in that email? To Dominguez or did they just say – It was denoted to Dominguez, yes. Okay. So you knew right then that the State Bar knew Dominguez had received it. Right, because he had filed a complaint or gave a verbal complaint. That's what I got from the phone call. Now you're telling me – I don't want to make – I want to make sure I understand you. You're saying that there was a due process violation because you didn't know that he had filed a complaint against you? No. I didn't know what his complaint was because – What about this litigation letter? What are the basis for sending this letter? That's later. This is why it's important, and I'll reiterate it because I'm probably saying a lot, but June 3rd, Dominguez got the letter, called me right that same day within minutes. We talked. I refreshed him who I am, blah, blah, blah. Five days later, the call comes from McCauley saying, hey, we got a complaint against you from this Dominguez. He says he doesn't know who you are. That's what the complaint was. He got this – this is what McCauley says to me. The complaint is from Dominguez is that you sent him this litigation preservation notice. He doesn't know who you are or why you sent it. This was recalled. This is after – five days after – Okay, let's leave aside the doesn't know who you are part. Let's just talk about the why you sent it. You knew that that's what they were looking at, why you sent that. Well, the reason – What difference does it make that he says he doesn't know you or does or doesn't know you? This is what I want to make sure you're getting. Yeah, I'm not getting it because, I mean, the question is they – it seems to me from everything that I've read, they were concerned about why you're sending litigation notices. They don't care whether you know these people or don't know these people. They want to know on what basis you send these notices. Okay, the point I'm making to you is, first, Dominguez says – calls me right after he gets it. I answer every question and I lay out what this is all about, okay? Five days later, he calls the state bar and says, I got this federation letter. I don't know this lady. I don't know why she sent it to me, okay? The state bar calls me and says, hey, we received a complaint against you from Mr. Dominguez. What's his complaint? That you sent him a letter and you don't know who he is. What's the allegation? That you sent him this letter and you don't know who he is. So then I say, that's impossible. Just talk to him. He got the letter. He called me minutes later. I talked to him. I explained everything. His letter has that same paragraph. It says, hey, I want to discuss relevant evidence you may have. This is a preservation letter for you to preserve it. Let's talk together and work together to do that. The reason why that's important is because the state bar is telling me that that's what the basis of it is, is that he doesn't know who I am. I told the state bar he does. I sent them those e-mails from 2011. What difference does it make whether he knows who you are or not? Because the allegation against me, I'm supposed to be able to know who my accusers are and what their allegations against me. What are they accusing me of? What is he accusing me of, of sending him a letter and he doesn't know me? What's he accusing me of, that he doesn't know why I sent him? He knows all of that. We went over it. In no part of anything I read did the state bar rely on the fact that he didn't know you as a basis for imposing discipline. Every allegation that I saw, everything that was talked about, why did you feel entitled to send a letter to anybody, whether you knew them or not, as a I'm sorry, Your Honor, for interrupting you. That comes later when the screaming level is issued. Before that, I don't know why, I don't know what the allegations are against me. There really wasn't any. I'm sorry to interrupt you back. But on June 8th you got this e-mail asking you to provide the basis for sending this notice. Do you know why I got that e-mail? Because I asked him to send me what Dominguez's allegation was that started this. So what's the basis for sending the letter? And that wasn't the allegation. The initial allegation was that I sent it and he doesn't know me. But I fixed all of that before. He had no reason to even contact the state bar because he called me right after he got it and I answered all his questions, explained everything. So at that point, five days later, why would he call the state bar and say his allegation against me did? He doesn't know me. Sure he does. I just talked to him five days earlier and reiterated all those e-mails. I was his prospective client. I'm looking to immigrate him to Mexico. You think he forgot that in five days and then decided to go ahead and file, initiate a complaint against me? And what I told them was, I believe he's doing this for antitrust purposes. And they said, no, the guy just didn't know you. And all the while they had that e-mail. They're telling me his complaint was just this verbal thing. He didn't know me. When I disproved that that could not be possible by sending them everything to show that he knew me, he knew I was in Mexico doing what I was trying to implement there, his reasoning cannot be honest. So at that point I lodged a verbal counterclaim. They refused to take anything in writing from me. And I said, well, you have something in writing from Dominguez. Send it to me. And they sent me my letter after that. They sent my preservation letter after that. And I said, hey, I thought you were going to send me his allegation. Was the basis for your complaint? My counter complaint? No, no, no, no. In the litigation you were contemplating. Was the basis for that the exchange you had with him in 2011? The basis for it evolved around that because my antitrust complaint had to do with the process I was going through under the NAFTA measures and then additional immigration measures as a professional. A lot of what the political things I was encountering and other issues I was encountering there and everything else that's in my complaint of antitrust and my finding out more in my investigation about Dominguez's relationship with some of these other defendants, the Supreme Court, the Character and Fitness Committee, the Examination Committee, the State Bar, his relationship with ASU and so on, who later we find out are trying to start a project, components of my project in Mexico. And I'm sorry we started going out too far with things, but the whole answer to your question was, again, I believe at that stage Dominguez was a straw man complainant. And a straw man complainant, anybody that becomes a complainant against another attorney in one of these disciplinary proceedings, hey, guess what? There's a rule in there that says they get copies of everything she's providing. We went over that and why I didn't do the 70. But there's also a rule in there that says they're subject to all of the rules of the Arizona Supreme Court, but because they're a witness, I cannot bring a claim against them regarding this investigation of me. What a great place to be in to be a straw man complainant bringing an antitrust charge against me, which what it would have amounted to had they given me that email from the get-go, that the affidavit shows they had before they sent the—before McCulley even called me. He had that email and told me there was nothing in writing. This guy's just saying he don't know you. He don't know why you sent him this letter. But that email shows before McCulley picked up the phone and called me, he had that email, where that email specifically accusing me of antitrust violation against Dominguez, who says my market is Mexico. Ms. Thomas is trying to prevent me from getting clients over there. I don't know why she's suing this Mexico University in Arizona. I don't know what her emails are about. McCulley had that before he picked up the phone to call me on that screening, but instead of sending me that, he told me there was nothing in writing. And when I asked him for what is my complaint, what is the complaint against me, he sent me my preservation letter. Okay, let me—before we run out of time, I have a few questions I want to make sure I cover. Okay. And then I'll give you a chance to wrap up. Okay. So after Judge O'Neill issued his order, did you file a motion for—I'm sorry, after the default order, did you ever file a motion for relief from default? I did not, Your Honor, file a motion for—I filed nothing related to that complaint. And the reason why, going back quickly to—after the original sin, everything that the State Bar did from there through the Probable Cause Committee, getting authorization to file that complaint in an action that really doesn't exist, then everything else, the default entry was under the other caption where no complaint was ever filed. So no, I did not. And within my response to the 58K, I lay all of that argument out. I also lay it out in what I'll get into when you allow me to finish with the grave thing. So you can see— Is that also the reason why you didn't appear at the mitigation hearing? Also, I did—prior to appearance, actually the morning of, I filed a motion for the disqualification and recusal of Judge O'Neill because of the record. It's replete within the record, his abuses of discretion, his favoritism to the State Bar, his maltemperment against me for some of the things he had said and those orders that were not true after I provided him with evidence that he needed to vacate the suspension. And when did you file a motion to disqualify him early? The date of that hearing? Oh, they had—after the filing of the complaint in that other matter, then there was a notice— What other matter? The one that doesn't exist that says in the matter against Sylvia, the suspended member. Oh. It's very significant that that complaint is the only document that has that caption. No other document— And you believe that—well, you're a gambler. I would add the guts to do what you did. Yeah, and I don't feel so much that it was a risky gamble because the violations of due process and equal protection of law prior to, which were the original sin, everything else under there, kind of similar to the way the fruit of the poisonous tree works, everything else after that that was done, was done based on the fact that they believed that I violated Rule 54-D-2. And I didn't. So because the evidence wasn't there, they didn't prove by clear and convincing evidence that I violated that rule. So let me ask again why you didn't file your disqualification motion earlier. I filed it—and I'm sorry, I filed it—I don't know the exact date right now. Well, didn't you have— I filed it at the time that I believed it was necessary. But you already knew or believed that he was— And it was because they said that—this is why. For the further proceedings of your actions. Yeah, so why didn't you file your motion to disqualify right then? I don't know how far after that. I'm sorry that I didn't. I don't know how far after that that I did. But because for my—my strategy was not to answer anything after that original sin. And I—after that notice came, saying that they're noticing the appointment of Judge O'Neill for further proceedings, again, I don't know the exact date. But then there was a— I can tell you the dates. Yeah. So the contempt hearing was February 28th. So that's the time, I guess. Whatever doubts you had, I suppose, at that stage, at the end of that hearing. Oh, I filed an appeal. I understand that. But you didn't file a motion to disqualify until June. Right. I filed the— Four months later. This is after there had been the proposed hearing panel report. Yeah. You filed it contemporaneously with your objection to the proposed report and a motion to disqualify. It was—yeah. And again, I wasn't going to respond to anything that had to do with the assumption that there was a complaint filed against me in the matter of Sylvia Thomas, a member. Because there was no complaint filed against me in that matter. And I have brought that to the attention of the attorney. Is this also why you didn't file or request a stay of your suspension pending your appeal? Because I had already filed the disqualification motion. And what happened after that is— No, I'm talking about— No, this is—I'm answering you. The suspension order. There was the order—not the interim suspension, the actual six-month suspension. Right. Why didn't you request a stay of that suspension? Yes. And I am telling you that. The reason why—and it's in the pleadings—that under the rule of the stay, under Rule 59, it says I can request a stay. But I have to request it from whom? Judge O'Neill, the one who I've already motioned to have him disqualified, to recuse himself. And when he received that motion, he appointed the panel member who he wanted to defend against that motion I filed. Hold on a second. So you could have filed a motion to stay with him, and then if he denies it, you appeal that to the Supreme Court. I had already appealed to the Supreme Court and asked to combine a second appeal that I made to the Supreme Court. And part of that was to deal with the abuse of discretion and the error in factual findings and conclusions of law against Judge O'Neill. What the Supreme Court said to me— But the Supreme Court could have stayed this pending their decision on you. I asked them to, and they declined. And here's where we get into those grave reasonings. Because, again, from the original sin, every proceeding that went on, there was more due process violations, there was more construction of rules not in favor of doing substantial justice, but just the contrary, where there was a discretion for the Supreme Court to rule that would avoid this miscarriage of justice. They, in my opinion, abused their discretion contrary to Rule 8E of doing substantial justice. And the Supreme Court, what they did was say, hey, you know what, we're going to look at Thomas' appeal and her motion to stay her appeal so she can file this other notice and combine the two. We're going to look at this as a special action. And because there's no hearing report on the record, what we're going to do is dismiss Thomas' appeal, and we're doing this with our discretion, until she can come back and appeal from either a decision that's appealable, an order that's appealable, or a final judgment that's appealable. Well, you finally got that suspension order was appealable, right? And you didn't move for a stay. I did not move for a stay because I'm asking the judge, who I've asked to be disqualified. And in the rule where it talks about a stay under 59, at that point, I'm giving that judge, who on the record has disfavored toward me, favored toward the bar, saying, vilifying me, I'm asking him to give me a stay. And then at the time of doing it, I'm giving him the authority to say, you know what, I could grant a stay without any limitations or restrictions. Or I could find that without a limitation or a restriction, you're a danger to the public. And then I can't. I mean, you either have a shot or no shot, and you didn't even attempt it. I didn't attempt there. I requested the Supreme Court to stay the proceedings based on some of these grounds regarding the abuse of discretion. You didn't petition the Supreme Court to stay your suspension pending the appeal. No, I did. I petitioned them to stay my suspension and let me continue with my appeal over the order. What document is that? I'm sorry? Where is that? What document is that? It's called an emergency. It's probably one of those documents I wanted you to provide. Is that one of the ones you identified? Yeah, let me tell you what letter it is. It was like an emergency motion to stay. I didn't see anything like that. Let me find a special action. And if I didn't put it on the list, I would add it. Okay, well, whatever. It's Z. I just put the order denying the stay. That's Z, but the motion, it was denying my motion. Can you also, in addition to AA through FF, would you also provide us with your motion to stay and the order denying stay? Yes. So Z and pre-Z, shall we say. Okay. Let me ask you, before I forget, what is the current status of proceedings at the Arizona Supreme Court? Okay, and I'll roll through those. They do not list. I filed, the Supreme Court dismissed my appeal on a technicality. That I did not timely file a designation and I didn't thereafter timely file the transcript. And they did that on December 5th. The next day, I filed a motion requesting them to extend that time and explain why. And part of why involves the declarations that are on record with the Ninth Circuit. When I requested to move this hearing to this date, I filed, I initially filed a motion requesting extra time to reply to the response to the order to show cause. In that motion, there's a declaration from me stating how I had been outside of the country in Mexico working to resolve some of those antitrust issues outside of court and settle those. And some various things occurred. I was granted that. And then I ended up filing a motion for a 45-day time to reset this hearing. I'm talking about the Arizona Supreme Court. I know. But in the Supreme Court, when I motioned them to vacate that appeal on the technicality because it wasn't of merit, I had the State Bar oppose it saying she didn't give any reason sufficient for us as good cause why she was late filing that designation or filing that transcript. And so when I wrote back, I attached copies because I had asked them to take judicial notice of what was on the record in this action. So what's the status now? Has the Arizona Supreme Court ruled yet? They sent a Arizona Supreme Court minute letter on January 9th saying there was an order entered denying my request. I received no such order. So I filed a motion for reconsideration and clarification under Rule 52 and 59. And I just filed that last week. And no action on that? No response. And in it, I brought it to the court's attention that the law of the land is to favor dismissal or disposition on the merit. Right. And that this technicality and, again, that is part of the grave error because through all this time, since this suspension order came and the orders to show cause from this court and from the district court, I've been in Mexico working at resolving some of the antitrust claims against those Mexico defendants that I'm sure are associated with straw man Dominguez, trying to work some of those things out so they won't interfere with my planned immigration to Spain for the same purpose. And other grave matters. I think we're going a little far. Only because of the show of the grave. Yeah. But I have two more questions. Okay. So first, I want to make sure I understand kind of precisely why you believe that providing the letters before you filed your antitrust action would have compromised that action. Okay. And second, whether providing letters actually did compromise your action. Okay. There are three or four different Supreme Court cases that are within some of the various documentation that provide that the best way for, we'll say, for example, these true defendants in my position, Arizona Supreme Court, State Bar, Character Fitness Committee, Disciplinary Court, Dominguez, and all of those Mexico defendants who probably want the Arizona State to come in there and do what I proposed in their jurisdiction. There's case law from the Supreme Court that says, you know, there's a strategy out there that defendants like this use. Before, when they know an antitrust case is coming against them, before it, they should go ahead and start laying the groundwork and bring their own antitrust suit against the potential antitrust complainant. But for that to work well, the complainant has to be someone in a similar position in the market, this market that I niched out to implement the program, but has to be somebody with similar credentials. And who would that be? Dominguez, the straw man complainant, who, again, licensed in Arizona the practice law, but at the time when we first met and he was giving me advice on what I was about to do in Mexico, he was only a foreign legal consultant. So let me just ask you along these lines. Briefly, what was the basic intention of your antitrust claim? What was the antitrust violation that you alleged in your complaint? Specific to these defendants I think would help best is that there were mandatory disclosures that every attorney has to make to be as part of their character and fitness examination. You know, we're supposed to disclose. To be admitted to the bar? Yes, to the State Bar of Arizona. Under Rule 37C, it says that those disclosures remain confidential and would not be disclosed absent some signing from me allowing that. I found out during my pre-investigation that some of that information somehow got into the hands of individuals in Mexico. And because of that, there are some defamation issues, the harm to my reputation, and then all of a sudden some of these other defendants, Mexico and Arizona alike, are trying to implement components of a project that I designed to implement there in Mexico. And the antitrust issue. Let me try to understand. You disclosed information that you believe was confidential as part of your admission. You learned that that information had been illegally disclosed to people in Mexico. Exactly. Now, what's the antitrust component? I get that. I get to see that there's some kind of a breach of their duty. There's a tort action potentially there. Where's the antitrust? The antitrust component is where this was done as a way, because this was a market I niched out, based on measures in the NAFTA that allows a professional like me, an attorney and a business consultant, to do certain types of work that provides for practical training functions and also to conduct seminars. And the issue is that this was to prevent me from being a lead competitor in that market that I niched out to do this type of work. Leading into it, regarding the seminars, I'm an interdisciplinary study undergraduate major, and then I have my degree in law. I went through the process in Mexico in order to get my studies revalidated there so that I could practice in both countries, based on specific things that are in my project. Because this information was sent out to try to eliminate me as a competitor in a market that I niched out, under antitrust law within the global commerce of Mexico and the impact of it hurting me here, and the goal was to make me look incompetent. And then all of a sudden, here comes this litigation, here comes this complaint from Dominguez, saying I'm trying to prevent him from getting clients in Mexico that was concealed for all that time. This is a conspiracy by people in Mexico. To use that information that was in your thing to prevent you from competing with them in whatever antitrust class you've identified. There's a 2015 Supreme Court case regarding North Carolina dental examiners. I'm familiar with that. I agree with that logic. I see. I didn't quite get the gravity of the complaint. Can I say one more thing on that quickly? Yes. Is that the reason, again, for my communicating with General Counsel Furlong at the State Bar when I first sent the preservation letter to him, I indicated to him specifically to look at some of the board and committee meeting minutes where, if you look at the timeline where I was in the process of implementing something in Mexico, dealing with these interdisciplinary studies seminars that have to do with promoting the inherent influence and governing role of the law in interdisciplinary careers. You're a doctor? Malpractice. You need an attorney. You're a dentist? Malpractice. You need an attorney. You're starting a business? Oh, you need an attorney to help you do that. And from the business side, oh, I do graphic design work, so let me form your corporation. Let me design your logo. Let me trademark your logo. Let me defend against people coming and trying to use your logo, so on and so forth. But the bigger piece of it was timing on that where there were actually committee and board member meetings where timing with what I was doing in there lined up with, hey, we're going to make this new pre-certification process for any attorney that's wanting to present continuing legal education seminars. They're going to have to go to this pre-screening. And you know what? Part of my thing, these are fundraisers. Part of that money goes to provide scholarships and paid practical training for some of the university graduates in Mexico who, once they finish their studies, they still owe money to the Secretary of Public Education. They still have to do practical training. It's not paid. They finish studying. Three years later, they still don't have their degree yet because they don't have practical training. And if they do, it's not paid and it's not in the area. I don't think you need to elaborate on that. For purposes of this proceeding, I think I get it. Hold on a second. So I have a copy here of the complaint, the one that you object to, because it says in the matter of a suspended member of the State Bar of Arizona. Right. And did you say earlier that it had an incorrect number on it as well? No, no. I never said anything. Just the caption. But this number, 2017-9053, was the action number. Yes, the action number is the same. And the reason why the caption… And was there another caption, some other documents that… Every other document. …had this 9053 but didn't say suspended member? Right. Otherwise, it said in the matter of a member of the State Bar and it had that 9053 number. Right. It's important, again, because probable cause order issued saying that they could file a complaint against me, but there was no probable cause based on that. So this has been extremely helpful to me, Ms. Thomas, to have you come here and clarify your argument. It filled in some blanks for me. I think I understand exactly what your contentions are. We only have a few more minutes. Okay. So I'd like you to wrap up. And if there are issues that we haven't covered that you feel you really have to get to, now's the time to do it. Okay. But I'm very grateful for you traveling all this way to appear. Well, I think the only issue that I want to just hammer in about, from the original sin of false testimony, intentionally omitted email communications, that everything that occurred from there is unenforceable. And including, as you will see on the record from the disciplinary proceeding to dealings with the Supreme Court and also with the federal court, there is a consistent construction of rules away from Rule 8E that provides that the judiciary should construe pleadings to do substantial justice. And this falls under the other grave reasoning why this court should not follow and give a reciprocal discipline. And specifically where there is Supreme Court law that says, discipline, long-term discipline, when you have six months plus a day, because just that plus a day is what makes it long-term. There's a record, I believe it's in Ray Snyder, that says that the Supreme Court of the United States recognizes that in Arizona, that one day is actually tantamount to disbarment. And it provides that an attorney would have to go through all kinds of hoops. Disclosure of financial information is whatever that state court says you've got to do, you've got to do it in order to try and get back in. And it's noted by the U.S. Supreme Court that this could take years, well beyond six months. And what's going to be happening in those years? That market is going to be overrun in Mexico with those defendants. I'm not able to practice there. For state law, you know, if I'm suspended right now, which I refer to as a sham suspension, but for me to practice— I just wanted to remind you that nothing that we do here is going to change that. Oh, I understand that. I'm only saying that because my aim in other countries is to be able to continue to practice federal law. My project in Mexico has to do with my practice of federal law, a lot to do with trademark, copyright, antitrust. My moving forward, the reason why I mention Spain, part of—from here I travel to Madrid and I'll be meeting at the embassy, the consulate in Barcelona, doing some—visiting some distribution outlets for Grupo Bimbo related to my practice, related to my project, and trying to establish myself there as I did in Mexico to be able to practice and implement my project. Can I do that if I'm suspended from the federal court? No. You are currently under suspension from the district court in Arizona. Yes, but I've also filed—I'm sorry. The district court filed an order of suspension and referred to it as reciprocal based on the fact that the Arizona Supreme Court dismissed my appeal, which I motioned for them to vacate because it's not on the merits. For the reasons that you already said. And I also sent a motion to the district court asking her to reconsider and clarify certain things because there was some misapprehension there in her ruling based on some language that she—that the court perceived as me saying, you know what, once my appeal in the Supreme Court is disposed of, then you can suspend me if you want to. And that's not what that language was intended to say. The language is a little bit different in the OSC for this court. The OSC response—I'm sorry, the OSC response for this court and the OSC response to a specific judge in a matter that I am representing a client on in the federal court. I point these things out to the district court. I also point out the big glowing thing that this disposition was not on the merits, that still there's the obligation for the district court to concur within the parameters of due process if it's going to reciprocally suspend. So there is a motion out there related to that that also asks for clarification regarding the rule says that the suspension—the order to show cause, the suspension order must be entered on a record. There was no electronic filing of the order to show cause. I was just given an email to send my response to, which I did. The order came from an email because I have to, through Rule 70G2, request this consideration. In that rule, there's language that says that I'm not to reiterate arguments that I previously made in the response to the order to show cause, and that specific language that talks about the order that was filed against me, suspending me. I addressed the fact that there was no order actually filed. I called and spoke to the clerk regarding that, also because this court filed its order for me to show cause. There's a case number. It's out there on the record. And because of these issues, I've submitted that. And so that's pending disposition as well. So, you know. And then the last thing with regards to this court is that this consistent construction of rules away from substantial justice and construction of rules that I feel are overt acts and furtherance of trying to prevent me from practicing law, not only in the state, but also in the federal courts and also in jurisdictions outside this country. And the grave and irreparable harm to me without due process of law, without equal protections of law, when you see this type of conduct going on, raising issues of where the federal court has its own, this court in particular, my ability to continue to practice here is not dependent on my ability to continue to practice in the state court, which you've made clear based on the limitations that you set forth for me to address here today. And because I believe the record shows clearly that there is an antitrust conspiracy and that various defendants have taken overt acts and furtherance to protect the state of Arizona with regards to the Supreme Court's conflict of interest there, the state bar. These are the regulators and the disciplinary investigators that they've put in charge, and they're violating their own rules and construing them in ways that offend due process, that offend an attorney's right to practice in areas that they choose to practice without these non-sovereign designees who are market participants in themselves trying to determine for me what area of law am I going to practice or decide that I can only practice under these restrictions that will be put upon me from a stay from the judge that disfavors me to only practice in this area of law only under supervision of whomever it is that they're promoting in these other markets outside of the country that I'm looking to continue to implement my program in. In Spain, and I've already received my permits to practice in Mexico, I have what they call CEDLA Profesional, which is my professional credentials, similar to a license to practice law here. I have that for my law practice, I have that for my MBA degree, and I also have that for my undergraduate degree, which was interdisciplinary studies. Part of that was communication. They don't offer interdisciplinary studies, but they gave me for communication. I satisfied those requirements. And I have my permanent resident permit that allows me to have these things. In Spain, where I'm going from here on the 20th, part of my immigration process as a professional, under the laws of Spain, it's based on their assessment, again, of my education, my law studies, my MBA studies, and my interdisciplinary studies, philosophy, communication in Spanish, and not dependent upon whether or not I'm a member of the bar. Under the NAFTA, there's a list of credentials, and membership was one, but it was not a requirement. It could be based on your degrees as well. So this conspiracy is attacking me from the standpoint of not being a member of the bar of the state and trying then to interfere with my ability to practice in the federal courts too. Evidence of that is the fact that when that suspension order was sent out, within 11 minutes, it was sent to both the Ninth Circuit and the district court in hopes of some type of a domino effect. But the dominoes stopped rolling, thank God, at the federal court level, where you say outside of the parameters of due process, we're not going to reciprocally suspend. So thank God for that. And in the meantime, I have to continue moving forward where I can, and that moving forward with the strategy for my project to work between the U.S. and other countries is quite dependent upon my ability to continue to practice in the federal courts. Thank you. So can you provide those additional documents, let's say, by a week from tomorrow? Yes. We'll set that. All right. So I'm going to hold off on preparing a report and recommendation until I've had a chance to review those documents. I want to take a more careful look at the e-mails. They're in the March affidavit. And then after that, I'll issue a report and recommendation that will be served on you. You'll have an opportunity to file any response you deem appropriate to that. Thereafter, that report and recommendation will be presented to a three-judge panel, and they will decide whether to accept my recommendation or not, or schedule further hearings or whatever. So that's the way things are going to go. Again, any further questions? With the submission a week from tomorrow, I'm just going to clarify that that submission is the documents. The AA through FF, the Z, and the filing that you made that led to Z. Okay. And the relevance you want me to describe? Oh, that's right. With respect to AA through ZZ, yeah, a description of why they're relevant to this proceeding. And may I ask one question for clarification before I go? In my submissions to the Federal District Court and also to the Arizona Supreme Court, with regards to reciprocal discipline, why it's relevant, I continue to state that there is Supreme Court and Ninth Circuit law on the record that those rulings are reviewable and reversible where there's no due process underlying the suspension. And so my first point is, should the federal court not vacate its current order based on what I've filed and we get to the point where that's a final order, I don't know how because it's not entered, but that's something reviewable by this court. Is that correct? This court has jurisdiction over final judgments of district courts under 28 U.S.C. 1291. Okay. And that's it. I think that answers your question? Yes, it does. Good. I'm sorry. Again, thank you for traveling and for providing your presentation today. And with that matter, this case will be submitted after you send in those additional filings. Okay. Thank you. Thank you.
judges: Appellate Commissioner Shaw